UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :          **INFORMATION**

   - v. -                         :          22 Cr. ____ (NRB)

DANSKE BANK A/S,                   :

                    :

          Defendant.           :          22 CRIM 679

- - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Bank Fraud)

The United States charges:

### DANSKE BANK

1.    DANSKE BANK, the defendant, is the largest bank in Denmark, headquartered in Copenhagen, Denmark. DANSKE BANK offers retail and corporate banking to individual and corporate customers internationally through a number of foreign operations and branches.

2.    From 2007 until June 1, 2008, DANSKE BANK offered banking services through a subsidiary in Estonia. From 2008 until 2019, DANSKE BANK operated a branch headquartered in Tallinn, Estonia (hereinafter "Danske Bank Estonia").

### THE SCHEME

3.    DANSKE BANK acquired Finland-based Sampo Bank in 2007, including Sampo Bank's large operation in Estonia. A significant part of Sampo Bank's Estonia business was providing

banking services to non-resident customers, that is, companies and individuals residing outside Estonia, including in Russia. DANSKE BANK knew this was a large part of Sampo Bank's Estonian business model and continued this business after acquiring Sampo Bank. The non-resident portfolio ("NRP") was, by far, Danske Bank Estonia's most lucrative business line, generating, over the life of the branch, over 50% of Danske Bank Estonia's profits. DANSKE BANK knew that many NRP customers conducted transactions in U.S. dollars, which required Danske Bank Estonia to use U.S. banks and bank accounts to process those transactions. By December 2013, DANSKE BANK knew that the NRP was high-risk because, among other reasons, its customers resided in high-risk jurisdictions, frequently used shell companies to shield the identity of their ultimate beneficial owner or the sender or recipient of transactions, and engaged in suspicious transactions through U.S. banks.

4.    Danske Bank Estonia had an inadequate and ineffective compliance program that applied to all customers, including the NRP. Danske Bank Estonia, through its International Banking Group ("IBG"), attracted NRP customers by ensuring that they could transfer large amounts of money through Danske Bank Estonia with very little, if any, oversight or scrutiny. IBG employees conspired with their customers to shield the true nature

of their transactions, including by assisting customers to conceal beneficial owners by establishing accounts for known shell companies and sometimes creating shell companies for customers in exchange for a "consulting fee."

5.    Danske Bank Estonia had practices and procedures that further enabled NRP customers to open accounts and conduct transactions without appropriate due diligence or monitoring, including allowing representatives to open NRP customer accounts from Russia and other countries without sending account opening documents to Danske Bank Estonia, permitting financial intermediaries such as unregulated money services businesses located outside of Estonia to open accounts, and opening accounts with minimal due diligence or know your customer ("KYC") review.

6.    By at least February 2014, as a result of internal audits, DANSKE BANK knew that some of the NRP customers were engaged in highly suspicious and potentially criminal transactions, including transactions through the United States. By the same time, DANSKE BANK also knew that Danske Bank Estonia's anti-money laundering ("AML") program and procedures did not meet the standards of DANSKE BANK's AML program and procedures and were not appropriate to meet the risks posed by the NRP.

7.    DANSKE BANK NRP customers conducted significant transactions in U.S. dollars using U.S. dollar accounts that Danske

Bank Estonia, with the knowledge of DANSKE BANK, maintained at various U.S. banks, including U.S. Bank 1 ("U.S. BANK 1"), U.S. Bank 2 ("U.S. BANK 2"), and U.S. Bank 3 ("U.S. BANK 3"), all federally insured financial institutions located in the Southern District of New York (collectively, the "U.S. Banks"). To open and maintain these accounts, each of the U.S. Banks required Danske Bank Estonia to provide account opening information and regular updates regarding its AML compliance program and controls, transaction monitoring, and customers and transactions. The U.S. Banks also required DANSKE BANK to provide information regarding DANSKE BANK and Danske Bank Estonia.

8.    The U.S. Banks further required DANSKE BANK and Danske Bank Estonia to respond to periodic inquiries regarding particular transactions or customers. Indeed, the U.S. Banks periodically made inquiries regarding suspicious transactions or suspicious customers whose transactions Danske Bank Estonia processed through the U.S. Banks.

9.    The information the U.S. Banks sought was material to the U.S. Banks' decision to maintain, and in the case of U.S. Bank 3, to open, U.S. dollar accounts for Danske Bank Estonia. DANSKE BANK and Danske Bank Estonia understood that the information provided in response to such inquiries was material, that the U.S. Banks expected honest, accurate, and complete responses, and that

the U.S. Banks would not open or maintain Danske Bank Estonia's U.S. dollar accounts without this information. These U.S. dollar accounts were critical to servicing NRP customers, who relied on access to the U.S. financial system via Danske Bank Estonia. In response to the requests from the U.S. Banks, DANSKE BANK misrepresented the state of Danske Bank Estonia's AML compliance program, transaction monitoring, and information regarding Danske Bank Estonia's customers and their risk profile, causing the U.S. Banks to maintain accounts, and U.S. Bank 3 to open an account, through which Danske Bank Estonia facilitated approximately $160 billion in transactions on behalf of its NRP customers between 2007 and 2016.

### DANSKE BANK Identified Problems with the NRP

#### *Regulators Brought NRP Concerns to DANSKE BANK*

10.   From the time DANSKE BANK purchased Sampo Bank in 2007 through at least December 2013, DANSKE BANK knew that regulators had concerns regarding the NRP and Danske Bank Estonia's business and AML practices. In 2007, the Central Bank of Russia ("CBR") sent a letter to DANSKE BANK that reported Danske Bank Estonia conducted transactions of "doubtful origin" related to customers "offshore and in the UK" that amounted to billions of rubles per month. The CBR explained that, while these transactions looked like payments for goods, those goods never crossed borders,

and it was, according to the CBR, "quite obvious that neither the goods nor securities nor services do exist in reality." The CBR concluded that "the mentioned transactions ... can be connected with the criminal activity in its pure form, including money laundering."

11.   Also in 2007, the Estonian Financial Supervisory Authority ("EFSA") issued a report criticizing Danske Bank Estonia's AML activities. Specifically, the report found that Danske Bank Estonia's policies were, in themselves, "mostly in compliance" with legal requirements under Estonian law; however, Danske Bank Estonia only "formally" adhered to these policies, and many aspects of its actual oversight for NRP clients were inadequate. In September 2007, the EFSA issued a precept directing Danske Bank Estonia to take a series of corrective actions to obtain better information about beneficial owners and the source of funds for the NRP. A subsequent EFSA examination in 2009 noted improvements, but it also highlighted persistent deficiencies in Danske Bank Estonia's KYC/AML policies. DANSKE BANK received copies or summaries of these examination reports.

12.   When DANSKE BANK acquired Sampo Bank, it undertook a project to bring the Baltic branches onto the central technology system DANSKE BANK had established, recognizing that there were some risks, including AML risks, presented by allowing the Baltic

branches to remain outside of the information technology ("IT") platform used by DANSKE BANK headquarters (the "Group"). Centralizing Danske Bank Estonia with DANSKE BANK's Group-wide IT platform would have allowed DANSKE BANK to directly monitor and/or conduct additional direct oversight of Danske Bank Estonia transactions and customers, including NRP customers and transactions Danske Bank Estonia processed through the U.S. Banks.

13. In 2008, DANSKE BANK cancelled the migration to the central technology system because the Executive Board, consisting of DANSKE BANK senior executives, concluded it would "simply be too expensive" and could cause irregularities. At a meeting of the Executive Board where this cancellation was announced, the minutes noted that the Board members understood it was "important that we display additional initiative in the area of compliance in consequence of our decision not to convert our Baltic banks, it is important that we make an extra effort in the compliance area." After the cancellation, Danske Bank Estonia remained on its own technology platform.

14. In 2012, the EFSA sent the Danish Financial Supervisory Authority ("DFSA") a letter that highlighted concerns with Danske Bank Estonia's AML controls. The DFSA shared these concerns with DANSKE BANK and noted that the EFSA had concluded that Danske Bank Estonia conducted a disproportionate amount of

the non-resident business in Estonia. The DFSA explained that the EFSA had raised these concerns with Danske Bank Estonia without significant changes at the branch. DANSKE BANK executives, including the former Head of Group Compliance and AML ("Compliance Executive-1"), immediately asked Danske Bank Estonia executives about prior responses to the EFSA, the reason for Danske Bank Estonia's "high market share of the mentioned high risk customers," any special KYC procedures for those high-risk customers, and how Danske Bank Estonia monitored transactions for high-risk customers to minimize AML risks. The DFSA inquiry also prompted DANSKE BANK executives to revisit the 2007 CBR communication and a summary of the EFSA's 2009 examination of Danske Bank Estonia.

15. Danske Bank Estonia employees, including the former Branch Manager of Danske Bank Estonia ("Branch Manager-1") and the former Head of AML at Danske Bank Estonia ("Estonia Compliance Executive-1"), prepared a memo for DANSKE BANK senior executives that identified the NRP as a "prudent and well organized" business. The memo acknowledged that the NRP customers were high-risk but claimed that Danske Bank Estonia did not open any accounts for clients whose business activity was not "understandable." The memo included a description of both the NRP's purportedly robust onboarding procedures and automated transaction monitoring procedures and noted that customers had to be approved by the

"Client Committee" ("CLICO"), which Estonia Compliance Executive-1 headed. These representations were not true; though the CLICO and other procedures existed on paper, in 2014 Danske Bank Estonia's regulator found that there was "no evidence" that Danske Bank Estonia followed its written procedures—including onboarding procedures—or reviewed those procedures to ensure they were compliant with law and working as intended.

16.   In a letter responding to the DFSA, Compliance Executive-1 repeated many of the statements contained in the Danske Bank Estonia memo, without taking any steps to confirm whether the representations in the memo were accurate or implemented in practice or whether the EFSA's findings of serious deficiencies in Danske Bank Estonia's AML program had been appropriately addressed. In particular, in a letter signed by Compliance Executive-1 and the former Head of Group Legal, DANSKE BANK informed the DFSA that DANSKE BANK was "very aware of risks being increased" as a result of the NRP customers and indicated that Danske Bank Estonia had adapted its monitoring procedures to address these increased risks. This was not accurate. In a follow-up communication to the DFSA signed by the former First Vice President, Group Financial Crime ("Compliance Executive-2"), more specifics were provided about the details of those monitoring procedures.

17. The DFSA continued its inquiries in April 2013, specifically sharing with DANSKE BANK's former Legal Head of Corporates and Institutions ("Internal Counsel-1") the EFSA's ongoing concerns that Danske Bank Estonia was not seriously addressing AML problems, particularly related to NRP customers. Internal Counsel-1 shared this with other DANSKE BANK executives. On April 4, 2013, Internal Counsel-1 asked Compliance Executive-1 for a meeting to discuss "AML in the Baltics," explaining that the EFSA told the DFSA that "we are not taking their AML enquiries seriously . . . . I promised a reaction from us to the DFSA management tomorrow."

18. The DFSA brought to Internal Counsel-1's attention certain Russian customers the CBR had, according to Compliance Executive-1, "blacklisted" but who nevertheless banked with Danske Bank Estonia. Internal Counsel-1 shared her concerns with Compliance Executive-1, who discussed them with the AML team, noting that "there is still some nervousness about the Russian customers in Estonia again." Compliance Executive-1 said he would direct the DFSA to the earlier 2012 memo DANSKE BANK had provided. Compliance Executive-2 responded that this "is actually a bit worrying. It may prove inadequate to refer to our previous memo. So should we try to clarify what it is more specifically that they are dissatisfied with or insecure about in Estonia?" Compliance

Executive-1 responded that, according to the DFSA, the "problem" was that Branch Manager-1 "brushed off the EFSA. We have blacklisted Russian customers, but are arguing that their transfers are made through a Russian bank, so what's the problem!!"

19.     On April 5, 2013, Internal Counsel-1 responded to the DFSA explaining that there was a "very special setup [for] Russian customers we have in Estonia, for the very reason that these customers involve a high risk." She indicated that she had not known that the CBR had raised concerns about certain Russian customers at Danske Bank Estonia, but that Compliance Executive-1 would take action immediately. On April 7, 2013, Compliance Executive-1 told other executives in Denmark and Estonia that the EFSA had the impression that DANSKE BANK was not taking the EFSA's concerns "very seriously" and that the DFSA was "now very worried because they have confirmed to the US authorities that we comply with the Danish FSA's requirements on AML." Compliance Executive-1 explained to other executives that it was "critical for the Bank that we do not get any problems based on this issue. We cannot risk any new orders in the AML area." On the same day, Compliance Executive-1 asked Branch Manager-1 to prepare additional information for a response to the DFSA regarding any additional conclusions related to the EFSA's concerns. Branch Manager-1 proposed a meeting with the EFSA, and a meeting was held with the

EFSA on April 25, 2013. At this meeting, the EFSA recognized "that the Bank's internal AML regulations are in compliance with the established requirements," but also pointed out that "risk appetite in Estonian Danske A/S looks above the average comparing with Estonian banking sector in general." Notes of this meeting were reviewed by the EFSA and then shared with DFSA.

20.   On April 8, 2013, Internal Counsel-1 told DANSKE BANK's former Chief Financial Officer, ("CFO-1") that she had confirmed that the issues the DFSA raised were correct and that Danske Bank Estonia had a deliberate policy to attract high-risk customers and was banking many high-risk customers, including a significant number of customers residing in Russia. She noted that the "business" was "fully aware" of the high-risk nature of the customers and "have established a particularly strict AML set-up in Estonia, exactly because of these customers." However, she also noted that there was new information from Estonia that "certain customers are actually blacklisted in Russia" but that "we have seen no proof of that" and that Compliance Executive-1 and a former Head of Baltic Banking (2008-2013) were looking into the issue.

21.   In summer 2013, DANSKE BANK initiated a business review of the Baltic region. The then-Head of Baltic Banking (2013-2018) ("Baltic Executive-1") led the review, which concluded in a November 2013 report. The report identified certain clear red

flags, including the size of the NRP and the existence of some unregulated financial intermediaries that were processing transactions through their Danske Bank Estonia accounts for unknown third parties. The overall conclusion, however, was that the NRP had "[e]xcellent compliance processes in all aspects of the business." While the report accurately represented the size of the NRP, it contained many misstatements about Danske Bank Estonia's compliance controls.

22. After reviewing a draft of the report, Compliance Executive-2 told Compliance Executive-1 that the volume of the NRP was larger than he had previously believed and pointed out the risk of Danske Bank Estonia's relationships with unregulated intermediaries. He explained to Compliance Executive-1 that DANSKE BANK typically viewed these relationships as "extremely high risk" and the same customers would not be approved in DANSKE BANK headquarters. Compliance Executive-2 noted that many of the third-party intermediaries were not overseen by a supervisory or regulatory authority, and thus DANSKE BANK could not have "any comfort on their AML/CFT [Countering the Financing of Terrorism] procedures." As a result, if the intermediary did not do customer due diligence "very thoroughly," then DANSKE BANK could not have adequate information about the payments from the intermediary or on behalf of its customers.

23.   Compliance Executive-2 stated that he "d[id] not doubt" the claimed "prudent and stable" AML environment in Danske Bank Estonia but recommended "dig[ging] deeper into the compliance and control procedures" because of the business with unregulated intermediaries and the large number of cross-border payments. Compliance Executive-2 explained that the monitoring of these intermediaries was "extremely critical in the light of the risk involved." Finally, Compliance Executive-2 noted that the EFSA had identified Danske Bank Estonia's appetite for risk as above average and called this a "very crucial piece of information which should be given serious thoughts when deciding how to proceed." Compliance Executive-2 asked Compliance Executive-1 whether DANSKE BANK wanted to be involved in such a "risky business" and whether Danske Bank Estonia "really [has] robust monitoring procedures in place regarding these non-resident customers, covering all relevant areas in general and non-regulated entities in particular." Compliance Executive-2 felt it was "a good idea to have some 'independent' eyes" on the NRP's compliance systems.

24.   Compliance Executive-1 passed along some of Compliance Executive-2's concerns to Baltic Executive-1 on October 17, 2013. In addition to sharing Compliance Executive-2's concerns, Compliance Executive-1 noted that some of these cross-border payments were likely designed to evade taxes, which would

need to be reported to the authorities. DANSKE BANK did not engage "independent eyes" at this time to review the NRP or Danske Bank Estonia's compliance controls, as Compliance Executive-2 had suggested.

*U.S. BANK 1 Brought NRP Concerns to the Attention of DANSKE BANK*

25.   U.S. BANK 1 also brought NRP concerns to the attention of Danske Bank Estonia and DANSKE BANK. As early as 2008, U.S. BANK 1 warned Danske Bank Estonia against restructuring clients' activities to avoid detection by U.S. BANK 1's transaction monitoring systems, a practice that Danske Bank Estonia had engaged in, claiming it promoted "transparency." Internally, in April 2013, U.S. BANK 1 observed that the NRP "lack[ed] transparency" and included "financial intermediaries" conducting transactions, which was a significant risk factor. In response to U.S. BANK 1's warning, Danske Bank Estonia assured U.S. BANK 1 it had taken mitigating steps, including automatic sanctions and AML monitoring, client visits, and a prohibition on third-party agents. As described in more detail below, these assurances by Danske Bank Estonia were false.

*A Whistleblower Highlighted NRP Concerns*
*and DANSKE BANK Audit Confirmed Those Concerns*

26.   In a series of emails beginning in December 2013, a Whistleblower, who was a senior employee at Danske Bank Estonia,

raised concerns within Danske Bank Estonia and DANSKE BANK that NRP customers were engaged in suspicious transactions and providing false account documentation, using shell companies, and potentially engaged in money laundering. The Whistleblower concluded that with respect to the NRP, Danske Bank Estonia "may itself have committed a criminal offense, . . . likely breached numerous regulatory requirements[,] [and had] a near total process failure."

27.    In response, DANSKE BANK conducted two targeted internal audits in January and February 2014. After only a few days, the DANSKE BANK audit team confirmed that some NRP customers were shell companies that had false or insufficient information in Danske Bank Estonia's customer files. The DANSKE BANK audit team also determined that Danske Bank Estonia conducted almost no due diligence on the NRP customers. This contradicted prior internal audits (which had been conducted almost entirely by Danske Bank Estonia employees) and information that Danske Bank Estonia had previously provided to DANSKE BANK in response to concerns the DFSA and other regulators raised. After reviewing only a few customer files, one member of the audit team ("Auditor-1") noted that client files for certain NRP customers reflected an "unorthodox structure" and that Danske Bank Estonia relationship managers seemed to know more about the customers than was

represented in the files. Auditor-1 described the results of the review as a "fire raging," concluded that customer relationships were deliberately structured to obscure beneficial owners, and was worried that the NRP accounts were being used to facilitate money laundering.

28. The DANSKE BANK internal audit team drafted a letter on February 7, 2014, that was broadly circulated among DANSKE BANK executives and confirmed that Danske Bank Estonia permitted customers with complex corporate structures, inadequate explanations for layered customer structures, and no visibility into their corporate structures, to conduct banking activities. The audit team documented significant gaps in AML practices, including insufficient transaction monitoring and Danske Bank Estonia's lack of "full information on the end-client of the Russia based intermediaries," which meant that Danske Bank Estonia was "not able to identify the actual source of funds and therefore acts against AML legislatory principles." In an audit report dated March 10, 2014, the internal audit team recommended a review of all NRP customers and Danske Bank Estonia transaction monitoring, and significant restructuring of Danske Bank Estonia AML policies and procedures.

29. Following these internal audits, DANSKE BANK commissioned an auditing firm ("Auditing Firm-1") to conduct a

review of gaps in the NRP's AML/KYC processes, which was completed
in April 2014. Auditing Firm-1 identified 17 shortcomings, most of
which mirrored the concerns raised by the Whistleblower and
identified by DANSKE BANK's internal auditors. Auditing Firm-1
confirmed that there was no automated transaction monitoring
system at Danske Bank Estonia and no verification as to whether
the manual transaction monitoring system was actually operating.
Auditing Firm-1 also concluded that all of the NRP customers were
high-risk and given the large number of such customers it was
"impossible that the senior management of [IBG] could be aware of
the personal circumstances of all of them," which meant that Danske
Bank Estonia was "not sufficiently knowledgeable about the
personal circumstance[s] of its highest risk customers to be able
to manage the AML risk."

30.   Compliance Executive-1 asked Auditing Firm-1 for a
more qualified conclusion, and Auditing Firm-1 stated that Danske
Bank Estonia had "critical gaps in the existing AML policy,"
including Danske Bank Estonia's failure to sufficiently document
the background of on-boarded customers that left it "more
susceptible to being used for money laundering." Compliance
Executive-1 pressed Auditing Firm-1 for a "gut feeling" on how
DANSKE BANK compared to other Baltic banks. Auditing Firm-1 replied
that Danske Bank Estonia's critical gaps were "greater than we've

seen in other banks in the region," and Danske Bank Estonia's peers had, by comparison, "more detailed procedures and documentation regarding decisions."

31. DANSKE BANK's response to the Whistleblower allegations, the internal audit reports, and Auditing Firm-1 report was deliberately insufficient and delayed. DANSKE BANK also did not disclose the Whistleblower allegations to any government authority or the U.S. Banks until the DFSA requested information pertaining to AML issues in Danske Bank Estonia at the end of 2017, despite the clear identification of suspicious activity within the NRP before that time. In February 2014, in-house counsel at DANSKE BANK's office in London ("Internal Counsel-2") wrote in an email to Compliance Executive-1 that his initial view was that DANSKE BANK should share the Whistleblower allegations with United Kingdom ("UK") law enforcement. Compliance Executive-1 ignored this view, and, contrary to it, told other DANSKE BANK executives that Internal Counsel-2 had said it was *not* necessary to disclose the allegations to UK law enforcement.

32. By late April 2014, Internal Counsel-2's initial view was being invoked for an even broader proposition—that it was not necessary to report to *any* authorities. DANSKE BANK executives discussed whether it was necessary to report the Whistleblower allegations to the authorities and whether to obtain outside legal

advice. On April 25, 2014, Internal Counsel-1, who did not recall speaking with Internal Counsel-2 herself about this topic, wrote to the former Chief Risk Officer ("CRO-1") that "you would like a Legal Opinion on whether we should report [the Whistleblower]'s allegations re the nonresident business and the partnership structures to the authorities. We have an internal assessment from [Internal Counsel-2] saying that we don't need to. As far as I understand it no one has started the process of getting that legal opinion yet but I will see to that next week if you still want that."

33.   In   2014,   DANSKE   BANK   executives   vetoed   an independent investigation that could have identified and prevented further violations of law by Danske Bank Estonia employees and customers.   In   May   2014,   DANSKE   BANK   engaged   a   corporate investigations and security consulting firm staffed by a former law enforcement officer ("Investigative Firm-1") to investigate allegations of wrongdoing in Danske Bank Estonia. CRO-1 and the former Head of Business Banking ("Group Executive-1") objected to hiring Investigative Firm-1 because of concerns that it would lead to additional "drama," and that it was unnecessary because DANSKE BANK planned to investigate the matter internally. DANSKE BANK canceled its contract with Investigative Firm-1 and conducted only a limited internal investigation of Danske Bank Estonia customers

and no investigation related to Danske Bank Estonia employees prior to public reporting about the problems in 2017.

34.  In a June 2014 strategy meeting, Group Executive-1 presented a proposal to the DANSKE BANK Board of Directors to wind down the NRP in a controlled way. Other executives discussed an alternative plan to sell assets, including the profitable NRP, to another bank. The former CEO of DANSKE BANK ("CEO-1") noted that the Baltic countries were important for many of the Bank's clients and he found it unwise to speed up an exit strategy as this might significantly impact any sales price. He concluded that DANSKE BANK needed to undertake a closer review of the business case. Group Executive-1 recalled that CEO-1 said that DANSKE BANK should proceed cautiously because there was "a lot of money" in the NRP. The Board of Directors was supportive of the proposed gradual repositioning of Danske Bank Estonia's business model but determined that DANSKE BANK should explore all options regarding the NRP and conduct further analysis. A board member who participated in this meeting later realized the information DANSKE BANK provided the Board of Directors did not reflect the magnitude of the problems identified at Danske Bank Estonia. In 2015, there was a subsequent effort to sell the Baltic branches, including the NRP, which was ultimately unsuccessful.

35.  DANSKE BANK instead opted for a gradual wind down of the NRP, allowing approximately $40 billion in additional NRP transactions through the United States from 2014 through 2016 (after the Whistleblower allegations).  One internal auditor ("Auditor-2") felt senior DANSKE BANK executives pressured Auditor-2 to downplay her concerns and told her that the internal audit conclusions were "exaggerated."  The former Head of International Banking ("Group Executive-2"), who was ultimately tasked with leading the response to the Whistleblower's concerns, described the NRP as a "campfire" that DANSKE BANK executives enjoyed while it was profitable but ran away from when it grew out of control.

36.  In May 2014, a member of the Business Banking group told Group Executive-1: "It is my view that the local control environment, Compliance/AML and Internal Audit together with the business management (probably primarily [the Whistleblower]) have let us down big time. [The Whistleblower] was smart enough to obtain whistleblower protection for his own criminal offences, but the matter should have consequences for the other functions."  Because of the deliberately slow pace of the wind-down of the NRP, DANKSE BANK did not hold employees accountable and DANSKE BANK continued to process highly suspicious and potentially criminal transactions through the United States.

## DANSKE BANK Defrauded Its U.S. Banking Partners

### *DANSKE BANK Misstatements to U.S. BANK 1*

37.  Throughout its relationship with U.S. BANK 1, Danske Bank Estonia provided false and misleading information about the NRP in response to U.S. BANK 1's inquiries. In September 2008, U.S. BANK 1 made a standard compliance visit to Danske Bank Estonia to discuss Danske Bank Estonia's compliance measures and the NRP. During those meetings, according to U.S. BANK 1's internal notes, two Danske Bank Estonia AML employees ("Estonia Compliance Employee-1" and "Estonia Compliance Employee-2," respectively) and a relationship manager ("Estonia Relationship Manager-1") made several false statements to U.S. BANK 1, including that there were no Danske Bank Estonia representative offices in Moscow, face-to-face client meetings in Estonia were required for all customers to open accounts, operations of clients were documented, and Danske Bank Estonia prohibited clients from using "dormant" UK companies, as opposed to companies that were "actively providing returns to Companies House and the equivalents."  However, as identified by the Whistleblower, there were multiple Danske Bank Estonia customers that were entities incorporated in the United Kingdom and moved millions of dollars through Danske Bank Estonia and the United States but reported zero income or holdings to Companies House, the UK's business registry. The Danske Bank Estonia

employees truthfully reported that when U.S. BANK 1 identified suspicious customers to Danske Bank Estonia, Danske Bank Estonia would "counsel a client to restructure to avoid catching the attention of [U.S. BANK 1's] monitoring. They encourage the client to break out their activity into two or three entities, which has the effect of splintering the activity." This was contrary to U.S. BANK 1's prior understanding that Danske Bank Estonia closed all accounts of clients with multiple inquiries. Danske Bank Estonia employees told U.S. BANK 1 that they lacked resources to deal with the inquiries U.S. BANK 1 raised regarding suspicious transactions. The Danske Bank Estonia employees also truthfully reported that Danske Bank Estonia did not have automated transaction monitoring and instead relied on manual review of transaction reports. U.S. BANK 1 had understood that DANSKE BANK was introducing a bank-wide automated transaction monitoring solution but learned at this meeting that this effort was cancelled, which left Danske Bank Estonia with no current automated transaction monitoring solution. Finally, Estonia Relationship Manager-1 also admitted that some Danske Bank Estonia customers were shell companies that did not want their ultimate beneficial owners ("UBOs") revealed.

38.   U.S. BANK 1 concluded that this meeting "revealed a potentially significant issue with the bank counseling clients

to avoid our monitoring system." As a follow-up to the meeting, U.S. BANK 1 employees emailed Danske Bank Estonia employees on November 3, 2008, stating they "were very concerned to hear that DANSKE [BANK] will work with a client to restructure their business following enquiries from correspondent banks. … We request that this practice is discontinued, if the clients request a restructuring of their business following enquiries made by [U.S. BANK 1] we ask you to alert us and forward the details of the replacement structure." U.S. BANK 1 also asked Danske Bank Estonia to keep U.S. BANK 1 updated on the "decisions and the timeframe" of the selection and implementation of an automated transaction monitoring system.

39. On November 7, 2008, U.S. BANK 1 had a follow up call with DANSKE BANK's former Head of Group Compliance and AML, former Deputy Head of Group AML, a Senior Account Manager, Estonia Compliance Employee-1, and Estonia Compliance Employee-2. During that call, the DANSKE BANK executives attempted to walk back comments Danske Bank Estonia employees made during the September meeting with U.S. BANK 1 by misrepresenting to U.S. BANK 1 that "Danske [Bank Estonia] does not advise clients to restructure their business after enquiries from [U.S. BANK 1]. They may advise customers that more transparency is needed in the activity. This may cause clients to divide activity into separate companies which

increases transparency because one entity business would be focussed [sic] on one activity. . . . Any suspicious behaviour by clients is investigated by [Danske Bank Estonia] in Tallin." DANSKE BANK also reported that "[U.S. BANK 1] had misunderstood the [September 2008] discussions in Estonia. The group wide AML soft ware [sic] will be rolled out to all branches including the Tallinn branch. This will be rolled out at the end of 2009."

40. Based on this conversation, U.S. BANK 1 believed that Danske Bank Estonia offboarded clients of concern and did not continue to bank UBOs of those customers under different corporate structures. U.S. BANK 1 also believed that Danske Bank Estonia had a solution underway for automatic transaction monitoring. This was false. On several occasions U.S. BANK 1 flagged problematic accounts and Danske Bank Estonia closed the account referenced and simply shifted the UBO's business to other entities.

41. For example, in December 2011, U.S. BANK 1 asked Danske Bank Estonia for more information on a shell company ("Shell Company-1"), which appeared to be transacting with entities subject to U.S. sanctions. In response, Estonia Relationship Manager-1 submitted a form with additional details, including the UBO of the account. In response to U.S. BANK 1's request as to whether there was "any additional information … regarding [Shell

Company-1], and/or any affiliates, to assist [U.S. BANK 1] in understanding the noted activity," Estonia Relationship Manager-1 responded "no," notwithstanding the fact that the UBO had three other accounts at Danske Bank Estonia. On February 17, 2012, U.S. BANK 1 directed Estonia Relationship Manager-1 not to send Shell Company-1 transactions through the correspondent account, noting the entity's link to money laundering in news reports. In response, Estonia Relationship Manager-1 represented that "[w]e have been already alerted about named activity and [Shell Company-1] has no longer account with our bank." In reality, Shell Company-1 closed the account itself, and the UBO continued to bank at Danske Bank Estonia through three other shell companies, as Estonia Relationship Manager-1 knew or should have known.

42.   In addition, DANSKE BANK never moved Danske Bank Estonia to the central technology system and did not tell U.S. BANK 1 that automated transaction monitoring was not implemented in Danske Bank Estonia. U.S. BANK 1 continued to meet regularly with DANSKE BANK and to ask about NRP controls and flag NRP suspicious customers or transactions. U.S. BANK 1 employees felt that Danske Bank Estonia employees responded promptly to these inquiries, though sometimes without adequate answers about the underlying purpose of relationships between counterparties. U.S.

BANK 1 designated Danske Bank Estonia a high-risk client due to the NRP and the volume of alerts on NRP transactions.

43. In April 2013, Danske Bank Estonia executives met with U.S. BANK 1 employees and discussed the NRP and Danske Bank Estonia's U.S. account. U.S. BANK 1 raised concerns that the NRP "lack[ed] transparency" and included "financial intermediaries" on behalf of unidentified UBOs, both significant risk factors. Danske Bank Estonia assured U.S. BANK 1 it had taken steps to manage its risks, including automated sanctions and AML monitoring, client visits, and a prohibition on third party agents. This information was false. As an August 2014 internal Danske Bank Estonia audit memo detailed, there was no automatic AML monitoring system for Danske Bank Estonia, and such a system would not have been effective because significant customer information was missing in Danske Bank Estonia's customer database. Danske Bank Estonia also routinely used agents in other countries to identify and onboard clients.

44. Following the April 2013 meeting with U.S. BANK 1, U.S. BANK 1 continued to raise concerns with DANSKE BANK about the high-risk NRP. Specifically, in May 2013, a U.S. BANK 1 executive ("U.S. BANK 1 Executive") reached out directly to CRO-1 to inquire about DANSKE BANK's view of the NRP. In June 2013, U.S. BANK 1 Executive met with CRO-1 and others in London. U.S. BANK 1

Executive told CRO-1 that U.S. BANK 1 expected DANSKE BANK to "reconfirm to their Estonia [branch] and to [U.S. BANK 1] that the Head office [*i.e.* DANSKE BANK headquarters] [compliance] principles would be adhered to." CRO-1 agreed and confirmed that DANSKE BANK was "compliant on both counts." This was not accurate.

45.   U.S.  BANK 1  Executive  followed  up  with  CRO-1, explaining that the NRP transactions Danske Bank Estonia processed through U.S. BANK 1 did not have "sufficient transparency" and thus resulted in significant suspicious activity reporting. CRO-1 discussed these concerns with Group Executive-1, among others, who concluded that U.S. BANK 1 would likely close the Danske Bank Estonia account and determined that DANSKE BANK needed to find a "plan b" for processing these transactions.

46.   U.S.  BANK 1  employees  believed  that  Danske Bank Estonia  offboarded  customers  that  U.S.  BANK 1  flagged  as suspicious.  Had  the  U.S.  BANK 1  employees  involved  in  the discussions with DANSKE BANK known that Danske Bank Estonia's representations regarding offboarding NRP customers and automated AML and transaction monitoring controls were false, they would have recommended exiting the relationship immediately. When one U.S. BANK 1 employee learned that Danske Bank Estonia continued to bank customer UBOs through U.S. BANK 1 using different shell companies, she felt this was "the first time in her career that

she had ever been misled in such a fashion" and, after this
occurred, she changed procedures to verify in writing that
offboarding included offboarding of the UBO.

47.   U.S. BANK 1 Executive, who managed the DANSKE BANK
relationship and coordinated the eventual closure of Danske Bank
Estonia's account, understood that Danske Bank Estonia's AML and
sanctions monitoring was automated. If he had known that was false,
he would have "run to his boss's door to notify him" and then gone
directly to U.S. BANK 1's Treasury department to "pull the plug"
on the relationship. This was because U.S. BANK 1 Executive had
concluded that bank customers, especially banks in the Baltic
regions, needed automatic monitoring programs or else "they would
be in big trouble."

48.   Because DANSKE BANK misrepresented its NRP banking
practices and insufficient AML programs at Danske Bank Estonia,
U.S. BANK 1 continued to bank Danske Bank Estonia. Between 2011
and 2013, Danske Bank Estonia processed $34 billion for NRP
customers through its account at U.S. BANK 1.

*DANSKE BANK Defrauded U.S. BANK 3*

DANSKE BANK Opened the U.S. BANK 3 Account Through Fraud

49.   In July 2013, senior DANSKE BANK executives worked
on "plan b" to find a new U.S. banking relationship for Danske
Bank Estonia because of concerns that U.S. BANK 1 would close its

U.S. dollar account with Danske Bank Estonia. DANSKE BANK knew that Danske Bank Estonia needed access to the U.S. financial system to process U.S. dollar payments for the NRP and that other U.S. banks would share the same concerns that U.S. BANK 1 raised regarding the NRP. DANSKE BANK executives recognized the need to find a "long term strategy" related to the NRP.

50.   At the same time, Danske Bank Estonia executives, including Branch Manager-1, discussed the need to design a strategy to "camouflage" the NRP business from DANSKE BANK executives, who were applying "great scrutiny" to the portfolio. A Danske Bank Estonia executive explained to Branch Manager-1 in an email that they had done this "exercise once before [in] 2006-2008 and we'll do it again" and noted that the "main thing is how we look in this case, not how it really is."

51.   DANSKE BANK executives ultimately decided to find a new U.S. bank to handle the NRP transactions before U.S. BANK 1 closed the Danske Bank Estonia account. In July 2013, CRO-1 explained the situation to Group Executive-1 as follows: "In the short term, I think it would be preferable for us to request closure of the [U.S. BANK 1 correspondent] account (and route through other correspondents) rather than have the ignominy of their telling us. Then we need to determine future strategy before the next one drops out!"

52.   U.S. BANK 1 indicated that it would no longer do business with Danske Bank Estonia but ultimately allowed Danske Bank Estonia to exit its U.S. dollar account voluntarily because U.S. BANK 1 wanted to preserve its relationship with DANSKE BANK. On August 1, 2013, Danske Bank Estonia and U.S. BANK 1 agreed that the U.S. dollar account would close within 90 days.

53.   Consistent with CRO-1's email, DANSKE BANK approached U.S. BANK 3, where DANSKE BANK had an established relationship, about opening a U.S. dollar account for Danske Bank Estonia. DANSKE BANK misrepresented the reason it was seeking a new account to U.S. BANK 3 and did not inform U.S. BANK 3 of U.S. BANK 1's concerns regarding the NRP. In July 2013, a DANSKE BANK Network Manager ("Group Employee-1"), who knew that U.S. BANK 1 would no longer process NRP transactions and that Danske Bank Estonia needed a new correspondent account for those transactions, told U.S. BANK 3 that DANSKE BANK was looking for a new Danske Bank Estonia U.S. dollar banking relationship to "concentrate[] . . . our payment flows with a limited number of providers."

54.   DANSKE BANK did not indicate that U.S. BANK 1 had raised concerns about the risks associated with the NRP and was exiting the relationship with Danske Bank Estonia. According to a relationship manager at U.S. BANK 3 who managed the DANSKE BANK relationship, the fact that U.S. BANK 1 had raised concerns about

Danske Bank Estonia would have been important information for U.S. BANK 3 to know before opening a U.S. dollar account for Danske Bank Estonia.

55.   U.S. BANK 3 expressed interest in the account and immediately asked for "an overview of the client base" that Danske Bank Estonia served, including customers "outside Estonia," and noted U.S. BANK 3 would need "to have confirmed that [DANSKE BANK] Copenhagen Head Office ensures that the relevant AML / KYC procedures in Estonia meet the home-state standards in Denmark." Group Employee-1 immediately told DANSKE BANK's former Head of Network Management ("Bank Executive-1") that DANSKE BANK "would not be in a position to give the above [AML/KYC] confirmation to U.S. BANK 3" because Danske Bank Estonia did not have appropriate transaction monitoring. Thus, as Group Employee-1 explained, "it would not be realistic to consider [U.S. BANK 3] as an alternative provider for the USD payments from Danske [Bank] Estonia." Bank Executive-1 shared Group Employee-1's concerns and later raised concerns directly to DANSKE BANK executives, including Compliance Executive-1, Baltic Executive-1, and Branch Manager-1, noting that "if we decide to move the USD payments to [U.S. BANK 3] it is important to know that we will be required to deliver very precise information to [U.S. BANK 3] regarding the USD payments."

56. Despite understanding these concerns, Compliance Executive-1 internally confirmed that Danske Bank Estonia met home-state standards (*i.e.*, DANSKE BANK headquarters in Denmark) and could meet U.S. BANK 3's account opening requirements. On August 6, 2013, Compliance Executive-1 wrote in an internal email that Danske Bank Estonia's "AML/KYC procedures meet the home state standards and that the standards in Estonia are specifically tailored to the customers identified as high risk customers." This was false. Indeed, in that same email Compliance Executive-1 identified internal gaps in Danske Bank Estonia's monitoring systems, such as lack of sanctions screening for incoming payments. Compliance Executive-1 justified his willingness to represent that Danske Bank Estonia met the home-state standards by noting that U.S. BANK 3's own screening mechanisms would reject payments, such as payments that violated sanctions, that Danske Bank Estonia did not block.

57. Based on this representation, Bank Executive-1 confirmed to U.S. BANK 3 on August 14, 2013, that DANSKE BANK would like to open the U.S. dollar account for Danske Bank Estonia and that Bank Executive-1 had asked the "Head of Group Compliance & Anti-Money Laundering [*i.e.*, Compliance Executive-1] to prepare a guarantee such as the one you request regarding the standard of the AML/KYC procedures of our Estonian Branch." Danske Bank Estonia

employees sent U.S. BANK 3 a presentation in October 2013 that falsely stated that Danske Bank Estonia followed the KYC and AML policies and practices of DANSKE BANK, though it does not appear that Compliance Executive-1's written confirmation was ever provided to U.S. BANK 3. The presentation also contained other misrepresentations, again falsely touting the existence of an automatic monitoring system and that all non-resident customers had to meet with Danske Bank Estonia employees in person.

58. Estonia Compliance Executive-1 also knowingly misrepresented the nature of Danske Bank Estonia's business in due diligence materials he completed as part of U.S. BANK 3's account opening process. Estonia Compliance Executive-1 completed a "Correspondent Banking Client Profile Form" that U.S. BANK 3 required for new correspondent accounts. That form specifically asked Danske Bank Estonia to identify "high risk" customers; in response, Estonia Compliance Executive-1 stated that Danske Bank Estonia had no high-risk clients under Danske Bank Estonia's AML policies, even though Estonia Compliance Executive-1 had co-authored the 2012 memo explaining that Danske Bank Estonia's compliance policies were tailored to its "high market share of . . . high risk customers." Estonia Compliance Executive-1 further misrepresented that Danske Bank Estonia had no physical presence in Russia, despite Danske Bank Estonia having employees who worked

out of a customer's Moscow office until 2015. Finally, Estonia Compliance Executive-1 represented that Danske Bank Estonia had "approved AML policies and procedures in place that require[d] the identification and verification of the Beneficial Ownership of [Danske Bank Estonia's] corporate customers." While there were written policies, the actual procedures Danske Bank Estonia followed were inconsistent with the written policies, as demonstrated by the Whistleblower allegations and subsequent internal audit and regulatory exams. Estonia Compliance Executive-1 made these misrepresentations despite serving as the head of the CLICO, which was, on paper, responsible for onboarding new NRP customers.

59. In October 2013, Estonia Compliance Executive-1 completed two additional forms for U.S. BANK 3 that contained more misrepresentations. U.S. BANK 3's Financial Institution Anti-Money Laundering Questionnaire contained a series of questions about Danske Bank Estonia's AML programs. On this form, Estonia Compliance Executive-1 falsely answered "yes" to the following questions:

a. Does the FI [financial institution] determine the appropriate level of enhanced due diligence necessary for those categories of customers and transactions that the FI has reason to

believe pose a heightened risk of illicit activities at or through the FI?

        b.   Has the FI implemented processes for the identification of those customers on whose behalf it maintains or operates accounts or conducts transactions?

        c.   Does the FI complete a risk-based assessment to understand the normal and expected transactions of its customers?

        60.  Estonia Compliance Executive-1 knew the responses to these questions were not true. As early as 2010, Estonia Compliance Executive-1 knew that Danske Bank Estonia's financial intermediary customers were not "completely transparent" and suggested closing down those clients. However, in 2013 Danske Bank Estonia still had a number of these clients that Estonia Compliance Executive-1 had previously identified in 2010 as non-transparent, and Danske Bank Estonia had made no substantial improvements to the policies for overseeing those clients. Estonia Compliance Executive-1 did not disclose this information to U.S. BANK 3.

        61.  A supplemental questionnaire Estonia Compliance Executive-1 provided to U.S. BANK 3 in October 2013 also contained false and misleading information. It stated that Danske Bank Estonia employed a mixture of manual and automatic transaction monitoring, including an internally developed automatic system.

Moreover, in the questionnaire Estonia Compliance Executive-1 stated that "real-time" monitoring occurred for all incoming transactions over €500,000, and that all outgoing transactions were screened against EU/UN/OFAC sanctions lists. It stated that all other monitoring occurred on daily, weekly, or monthly bases based on "certain indicators." In reality, Danske Bank Estonia had no automatic transaction monitoring system. While certain transactions over €500,000 were flagged for manual review, the 2014 EFSA audit found that manual review was entirely perfunctory and primarily handled by NRP relationship managers (Estonia Compliance Executive-1 himself sometimes reviewed these transactions as part of his responsibilities), while the Auditing Firm-1 audit determined that manual review procedures could not be verified in practice. With respect to the review of transactions under €500,000, the EFSA found numerous instances where NRP customers engaged in transactions under the €500,000 threshold that violated Danske Bank Estonia's written policies.

62. U.S. BANK 3 relied on these various material misrepresentations and opened Danske Bank Estonia's U.S. dollar account in October 2013. Between account opening and the closure of the NRP in January 2016, DANSKE BANK processed transactions totaling approximately $3.8 billion through the U.S. BANK 3 U.S. dollar account on behalf of Danske Bank Estonia's NRP customers.

63.   While DANSKE BANK was providing this information to U.S. BANK 3, DANSKE BANK executives were conducting a business review of the NRP in response to regulatory concerns, leading some DANSKE BANK executives to question whether Danske Bank Estonia conducted appropriate oversight of the NRP. By early 2014, as a result of the Whistleblower's complaints, the internal and Auditing Firm-1 audits, regulator outreach, and U.S. Bank concerns raised to DANSKE BANK, DANSKE BANK was aware of systemic KYC/AML failures, non-transparent shell company accounts, and suspicious transactions related to the NRP. DANSKE BANK did not correct any misrepresentations to U.S. BANK 3, never shared this information with U.S. BANK 3, and did not take any meaningful steps in response to these issues to stop the NRP's high-risk U.S. dollar transactions through U.S. banks.

### DANSKE BANK Continued to Defraud U.S. BANK 3 as Part of the Ongoing Due Diligence on the Account

64.   DANSKE BANK had several opportunities to be truthful with U.S. BANK 3 about the issues with the NRP, but instead continued to affirm and reiterate its false statements during subsequent communications with U.S. BANK 3. For example, in March 2014 a KYC Officer in Denmark completed a questionnaire for U.S. BANK 3 providing information on "[a]ll countries where DANSKE [BANK] is represented." The answers repeated many of the false

answers from previous questionnaires, including a representation that DANSKE BANK's AML policies were applied "in locations outside of [the home] jurisdiction," and that DANSKE BANK (and its branches) had "implemented processes for the identification of those customers on whose behalf it maintains or operates accounts or conducts transactions."

65.  In July 2014, U.S. BANK 3 employees met with Compliance Executive-2 and a Group employee to discuss the general structure of DANSKE BANK's AML program. U.S. BANK 3 employees expected Compliance Executive-2 to disclose any concerns with Danske Bank Estonia transactions at this meeting. To the contrary, Compliance Executive-2 reassured U.S. BANK 3 about the overall compliance structure of DANSKE BANK and its branches. He confirmed that whenever DANSKE BANK identified suspicious transactions involving shell companies, it sought invoices. He also did not disclose any of the serious failures DANSKE BANK and its regulators had identified regarding Danske Bank Estonia. Based on these inaccurate reassurances, U.S. BANK 3 canceled a subsequent compliance visit to Estonia after the July 2014 meeting and instead planned to review a sample of payments originating in Danske Bank Estonia to ensure they were in line with U.S. BANK 3's expectation. Compliance Executive-2 understood that U.S. BANK 3 expected

truthful and accurate responses to the questions and later admitted that the answers he provided were "imprecise."

66.  DANSKE BANK continued to provide misleading information to U.S. BANK 3 about Danske Bank Estonia's compliance program. In late 2014 and early 2015, U.S. BANK 3 conducted a correspondent "refresh" with Danske Bank Estonia, and DANSKE BANK coordinated the responses. Estonia Compliance Employee-2 drafted responses to a U.S. BANK 3 supplemental questionnaire in December 2014 at Compliance Executive-2's direction. This questionnaire was identical to the questionnaire Estonia Compliance Executive-1 completed in October 2013, and Estonia Compliance Employee-2 repeated the false answers Estonia Compliance Executive-1 had provided in October 2013, including misrepresentations about Danske Bank Estonia's "automatic" monitoring systems. Estonia Compliance Employee-2 also falsely stated that the automatic monitoring system had been rated "satisfactory" by internal audit.

67.  U.S. BANK 3 requested, among other things, the "date and headline outcome" of Danske Bank Estonia's "last AML regulatory examination." In September 2014, the EFSA issued a preliminary report of its assessment of Danske Bank Estonia's lack of KYC and AML monitoring, which was highly critical of Danske Bank Estonia, and indicated a final report was forthcoming. The preliminary report was widely discussed by DANSKE BANK executives,

with one executive noting that if only half of the EFSA report were correct, then DANSKE BANK should be moving "much faster" to shut down all non-resident business.

68. On December 12, 2014, the EFSA issued its final inspection report. Internal Counsel-1, Compliance Executive-1, and Group Executive-2 received an English translation of the summary on December 17, 2014, and Compliance Executive-2 received a copy on December 19, 2014. While the final EFSA report was less critical than the draft report, it still concluded, among other things, that Danske Bank Estonia systematically established business relationships with clients "in whose activities it is possible to see the simplest and most common suspicious circumstances" including recently established companies with no business history that operated in apartment buildings without any public facing profile. The EFSA final report explained that Danske Bank Estonia was willing to help its clients to establish accounts rather than perform independent due diligence because the economic interest in profit outweighed the performance of due diligence required by law, that Danske Bank Estonia employees guided customers on how to avoid review of transactions, and that Danske Bank Estonia asked clients to terminate their accounts rather than cancel the account and report it as required. The EFSA report concluded that "Danske Bank [Estonia] ignores its own rules of procedure established for

the prevention of money laundering and terrorist financing" and the exam "clearly proves that the rules of procedure and internal controls are not working."

69.    On December 19, 2014, the same day that Compliance Executive-2 received a copy of the critical EFSA report, U.S. BANK 3 asked an employee at DANSKE BANK for more information on internal audit conclusions and regulatory review of Danske Bank Estonia.

70.    The initial draft of DANSKE BANK's response, which Estonia Compliance Employee-2 prepared, answered U.S. BANK 3's questions in detail and revealed that DANSKE BANK internal auditors and outside auditors agreed that Danske Bank Estonia's AML/KYC program was severely deficient. Compliance Executive-2 edited the draft response to provide limited information to U.S. BANK 3, suggesting that Danske Bank Estonia's problems were minimal and had been remediated. Despite receiving the critical draft and final EFSA report, Compliance Executive-2, after consulting with another DANSKE BANK employee, provided the revised misleading written responses that minimized the compliance issues at Danske Bank Estonia and did not reveal the existence of the critical EFSA exam.

71.    Based on the representations of Compliance Executive-2 and Estonia Compliance Employee-2, U.S. BANK 3 proceeded with the account refresh and continued to process U.S. dollar transactions for Danske Bank Estonia.

DANSKE BANK Continued to Process Transactions for Shell
Companies Through U.S. BANK 3 Against U.S. BANK 3's Explicit
Instructions

72.   In May 2015, an officer at U.S. BANK 3 ("U.S. BANK 3 Officer") contacted Compliance Executive-2 to report suspicious payments through Danske Bank Estonia accounts. U.S. BANK 3 Officer noted, "I spoke to [Estonia Relationship Manager-1] who confirmed that these shell companies are ultimately owned by Russian individuals/Corporates who set up these shell companies to hide the fact that they are actually owned by Russians, giving them more favourable contract negotiations with global commercial trading firms." U.S. BANK 3 Officer requested that "all payments on behalf [of] any Shell Company does not get routed via Danske Bank Estonia's USD [U.S. BANK 3 account]." U.S. BANK 3 Officer recalled that neither Compliance Executive-2 nor Estonia Relationship Manager-1 raised concerns regarding his request and thus he understood that DANSKE BANK would follow the request.

73.   While Compliance Executive-2 forwarded U.S. BANK 3 Officer's email internally on May 11, 2015, to numerous DANSKE BANK officials, including Bank Executive-1, DANSKE BANK ignored U.S. BANK 3's request until August 12, 2015. One DANSKE BANK executive described DANSKE BANK's inaction as "unacceptable," stating that there was a "chain break[]" in the AML Department that allowed U.S. BANK 3's request to fall through the cracks.

74. Even after DANSKE BANK delayed in reviewing U.S. BANK 3's request, it deliberately chose to ignore U.S. BANK 3's core request not to route NRP shell payments through U.S. BANK 3, and in fact increased those payments. During this same period, U.S. BANK 2 made the decision to stop processing payments through Danske Bank Estonia's U.S. dollar account. DANSKE BANK decided to reroute NRP U.S. dollar transactions that had previously gone through U.S. BANK 2 to U.S. BANK 3. DANSKE BANK executives conceded that this arrangement was directly contrary to U.S. BANK 3's no-shell request but justified it because they were in the process of shutting down the NRP in its entirety. During these discussions, DANSKE BANK executives also revealed their concern that U.S. authorities would discover problems at DANSKE BANK, with the Executive Vice-President in Group Compliance and AML noting that "[w]e should make sure that we don't create a relationship where U.S. BANK 2 suddenly feels the need to share their concerns about [DANSKE BANK] with U.S. regulators."

75. DANSKE BANK never disclosed this decision to U.S. BANK 3. Nevertheless, DANSKE BANK unilaterally moved ahead with its plan and routed all U.S. dollar transactions, including more than $200 million in NRP transactions and suspicious shell company payments, through U.S. BANK 3 from late 2015 until the NRP was closed in January 2016. During this period, U.S. BANK 3 observed

an increase in suspicious transactions that were sent through the U.S. BANK 3 account.

76.   Had U.S. BANK 3 employees understood the nature and extent of DANSKE BANK and Danske Bank Estonia's misrepresentations and associated problems at the time, it would have affected their decision to open and maintain a U.S. dollar account for Danske Bank Estonia.

**DANSKE BANK Closed the NRP and Ultimately Danske Bank Estonia**

77.   DANSKE BANK was not successful in selling the Baltic branches, including the NRP, and closed the NRP in January 2016. DANSKE BANK commissioned an internal investigation of the Estonia matter in 2017 and voluntarily made the results of the investigation public in September 2018. After some of the concerns DANSKE BANK internally identified regarding Danske Bank Estonia came to light publicly, the EFSA instructed DANSKE BANK to close Danske Bank Estonia, which DANSKE BANK completed in 2019.

78.   As part of its internal investigation, and based on a review of publicly available information, DANSKE BANK determined that Danske Bank Estonia had processed through the U.S. Banks billions of dollars in transactions associated with money laundering and other criminal schemes, including Russian criminal schemes.

## STATUTORY ALLEGATIONS

79.   From at least in or about 2008, up to and including in or about January 2016, in the Southern District of New York and elsewhere, DANSKE BANK A/S, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344(2).

80.   It was a part and object of the conspiracy that DANSKE BANK A/S, the defendant, and others known and unknown, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, the deposits of which were then federally insured, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344(2).

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

81.   As a result of committing the offense alleged in Count One of this Information, DANSKE BANK A/S, the defendant, shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

<u>Substitute Asset Provision</u>

82. If any of the property described above as being subject to forfeiture, as a result of any act or omission of DANSKE BANK A/S, the defendant,

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third person;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


_____
BRENT WIBLE
Acting Chief, Money Laundering
and Asset Recovery Section
Criminal Division
United States Department
of Justice


_____
DAMIAN WILLIAMS
United States Attorney for
the Southern District of
New York

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

### - v. -

### DANSKE BANK A/S,

### Defendant.

---

### <u>INFORMATION</u>

22 Cr. (NRB)

(Title 18, United States Code, Section 1349.)

---

DAMIAN WILLIAMS
United States Attorney

---